FRASER WHITE, administrator, *vs.* TOWN OF SEEKONK.

Bristol.    October 7, 1986. — November 12, 1986.

Present: GREANEY, C.J., QUIRICO, & GRANT, JJ.

*Imprisonment. Negligence,* Jailor. *Municipal Corporations,* Liability for tort. *Practice, Civil,* Summary judgment.

In an action against a town pursuant to G. L. c. 258, the Massachusetts Tort Claims Act, alleging negligence associated with the suicide of a prisoner in the custody of the town's police department, it was error to allow the town's motion for summary judgment where the undisputed facts disclosed by the record, considered in light of the findings later reported in a study of prisoner suicide by a special legislative commission, compelled the conclusion that the plaintiff was entitled to a jury trial on the question whether the police knew or should have known that the defendant was a suicide risk. [140-143]

CIVIL ACTION commenced in the Superior Court Department on May 23, 1984.

The case was heard by *Chris Byron, J.,* on a motion for summary judgment.

*Bruce E. Thompson* for the plaintiff.

*Richard T. Corbett* for the defendant.

GRANT, J. This is a Superior Court action for wrongful death (G. L. c. 229, § 2) to recover the damages sustained by those entitled thereto when the plaintiff's decedent (White) committed suicide on August 28, 1982, while detained in the lockup maintained by the police department of the defendant town. G. L. c. 258. The defendant moved for summary judgment on the ground that "[t]he facts, as conclusively established by the pleadings and discovery, do not give rise to the breach of any duty owed by the defendant to [White]." The motion was supported (1) by an affidavit of the arresting officer, who asserted, among other things, that while in his presence White "did not say anything or do anything which indicated to me

that he posed a suicidal risk" and (2) by a deposition the plaintiff had taken of the lieutenant who had been in charge of the police station when White was brought in and who had participated in the booking process. The deposition contained professions of ignorance comparable to those proffered by the arresting officer.[1] The motion was allowed without explanation, and the plaintiff appealed from the ensuing judgment of dismissal.

We must first place this case in proper perspective. In *Slaven* v. *Salem,* 386 Mass. 885 (1982), the court assumed, without deciding, that the duty which a jailer owes to his detainee is that which is enunciated in the Restatement (Second) of Torts § 314A (1965) for common carriers and innkeepers, which the court paraphrased as follows: "One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a duty (1) to protect [the other] against unreasonable risk of physical harm, and (2) to give [the other] first aid after [he] knows or has reason to know that [the other] [is] ill or injured, and to care for [the other] until [he] can be cared for by others." 386 Mass. at 887. The court did not have to decide whether § 314A of the the Restatement reflects the law of this Commonwealth because the case went off on the ground that the defendant had established by the uncontroverted affidavits offered in support of its motion for summary judgment that none of the various police officers who had had any contact with the decedent (who had been arrested for open and gross lewdness) had known or should have known that the decedent was a suicide risk. 386 Mass. at 889-890.

The objective of the motion for summary judgment in the present case was to secure a ruling of law by the Superior Court to the effect that the defendant's police department had not committed a breach of the duty owed to a detainee such as White which was postulated in the *Slaven* case. The difficulty

---

[1] We deal later with other aspects of the deposition, as well as with the material portions of the other documents which were before the motion judge.

with any such request for a ruling is that it asked the court, rather than the jury claimed by the plaintiff, to decide the very sort of question which should not have been decided on summary judgment. Compare *Mullins* v. *Pine Manor College,* 389 Mass. 47, 56 (1983) ("Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury"); *Appleby* v. *Daily Hampshire Gazette,* 395 Mass. 32, 37 (1985) ("[S]ummary judgment is rarely appropriate with respect to the merits of a negligence case"); *Doherty* v. *Belmont,* 396 Mass. 271, 275 (1985); *Foley* v. *Matulewicz,* 17 Mass. App. Ct. 1004, 1005 (1984); 10A Wright & Miller § 2729, at 194 (1983). Summary judgment is especially disfavored where (as here) knowledge or state of mind is at issue. *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81, 86 (1984). Accordingly, the defendant in this case should not have prevailed on its motion for summary judgment unless (as in the *Slaven* case) it appeared from the uncontradicted facts set out in the discovery and other documents that there was nothing for a jury to decide on the question whether the defendant's police knew or should have known that White was a suicide risk.

We think it will be instructive on that point to consider the undisputed facts disclosed by the record in light of the findings concerning fifty-four suicides which were made by the Special Commission to Investigate Suicide in Municipal Detention Centers in the final report (Suicide in Massachusetts Lockups 1973-1984) which the Commission submitted to the General Court on May 1, 1984:[2]

> 1. White had been arrested for driving under the influence of intoxicating liquor and for possession of a class

---

[2] The Commission was established and funded by St. 1983, c. 289, § 2, item 0185-7824. Most of the Commission's recommendations as to the construction and surveillance of lockups found their way (some of them almost verbatim) into G. L. c. 40, § 36B, inserted by St. 1985, c. 208 ("An Act further regulating the care and protection of detainees in certain lockup facilities"), which, by virtue of St. 1985, c. 326, § 4, took effect on April 30, 1986.

D substance; 68.6% of the suicides reported to the Commission had been committed by detainees who had been arrested on alcohol related charges or taken into protective custody because intoxicated (*id.* at 47).

2. White was "very drunk" and "very unsteady" when booked; 73.6% of the reported suicide victims had been intoxicated to some extent when brought into the police station (*id.* at 50).

3. White was thirty-one years old; the highest percentage of reported suicides (30.4%) had been in the age group from twenty-eight to thirty-two (*id.* at 40).

4. White had previously been arrested for intoxication in public (1969), for possession of narcotics (1970), and for leaving the scene of a motor vehicle accident after causing property damage (1980); 97.1% of the reported suicide victims had records of prior arrests (*id.* at 46).

5. The lieutenant in charge of the police station who participated in booking White was aware of at least the earlier narcotics charge; 50.0% of the reported suicide victims were known to the police who detained them (*id.* at 49).

6. White lived in East Providence, Rhode Island, which adjoins Seekonk; 66.7% of the reported suicide victims were natives of the community in which they were arrested (*id.* at 49).

7. White hanged himself, as did 96.2% of the reported suicide victims (*id.* at 64).

8. White hanged himself with his sweatshirt; 77.4% of the reported suicide victims hanged themselves with articles of clothing (other than shoelaces or belts) which had not been taken away from them (*id.* at 65).

9. White was arrested at approximately 7:48 P.M., was brought into the station at approximately 8:00 P.M., and hanged himself somewhere between 11:00 and 11:15 P.M.; 83.7% of the reported suicides occurred within four hours of the victims' being placed in lockups (*id.* at 56).[3]

---

[3] We shall forbear from illuminating any more of the available comparisons between White's circumstances and those of the suicide victims who were

We do not know whether the Seekonk police department responded to the questionnaire which the Commission sent to all municipal police departments and to all State police substations throughout the Commonwealth and which yielded the statistics which were compiled by the Commission's staff.[4] We can not vouch for any of the Commission's statistics or conclusions. We are confident, however, that enough appears to compel the conclusion that the plaintiff is entitled to a jury trial on the question whether the Seekonk police knew or should have known that White was a suicide risk, as well as on all the other issues raised by the pleadings.[5]

*Judgment reversed.*

---

studied by the Commission. Counsel would do well to study the Commission's report in the course of preparing for trial.

[4] The response rate from the various police departments with lockups was 59.5%

[5] We note that other appellate courts have reached comparable conclusions. See, e.g., *Kanayurak* v. *North Slope Borough,* 677 P.2d 893, 894, 899 (Alaska 1984); *Overby* v. *Wille,* 411 So.2d 1331, 1333-1334 (Fla. Dist. Ct. App. 1982); *Thomas* v. *Williams,* 105 Ga. App. 321, 329 (1962); *Dezort* v. *Hinsdale,* 35 Ill. App. 3d 703, 711 (1976), *S.C.,* 109 Ill. App. 3d 976 (1982); *Sudderth* v. *White,* 621 S.W.2d 33, 35 (Ky. 1981); *Shuff* v. *Zurich-American Ins. Co.,* 173 So.2d 392, 395 (La. Ct. App. 1965). The case of *Miga* v. *Holyoke,* 398 Mass. 343 (1986), was decided under 42 U.S.C. § 1983 (1982) although the complaint also contained a count under G. L. c. 229, § 2.