BRENDA J. PRATT, individually and as special administrator,[1]
*vs.* GARY L. MARTINEAU.

No. 06-P-283.

Franklin. November 14, 2006. - August 6, 2007.

Present: PERRETTA, COWIN, & MILLS, JJ.

*Firearms. Negligence,* Duty to prevent harm, Proximate cause, Foreseeability
of harm, Entrustment, Emotional distress, Wrongful death. *Proximate
Cause. Emotional Distress. Wilful, Wanton, or Reckless Conduct. Wrongful
Death.*

In a wrongful death action brought against the defendant parent, alleging that
the defendant was negligent in his failure to ensure the safe storage of the
gun that he had purchased for his teenage son, the judge erred in granting
summary judgment in favor of the defendant, in circumstances where the
risk of an accidental shooting by someone visiting or living in the son's
apartment, where the son kept the loaded gun in his bureau drawer, was
foreseeable to the defendant [674-676]; further, the facts set forth in the
summary judgment materials were sufficient to put to the jury the question
whether the defendant negligently entrusted the gun to his son while the son
resided at the apartment, in light of what the defendant knew and could have
known as the owner of both the gun and the apartment building [676-678],
and the question whether the defendant's actions or inaction constituted
reckless conduct also presented a question to be resolved by a jury [680-681].
In a wrongful death action, the judge erred in granting summary judgment in
favor of the defendant on the plaintiff's claim of emotional distress, where
the plaintiff provided objective evidence to corroborate the distress alleged.
[678-680]

CIVIL ACTION commenced in the Superior Court Department on
January 7, 1999.

The case was heard by *C. Brian McDonald,* J., on a motion
for summary judgment.

*John J. Stobierski (Danielle J. Barshak* with him) for the
plaintiff.

*Michael W. Garland* for the defendant.

[1]Of the estate of Ryan R. Perry.

PERRETTA, J. Gary L. Martineau (Gary) was the licensed owner of a handgun that he purchased for his teenage son Paul Martineau (Paul),[2] who was too young to buy a firearm. See 18 U.S.C. § 922 (1968) (unlawful to sell a firearm to one less than eighteen years of age). Paul's friend, Colin Murley, accidentally shot and killed Ryan R. Perry with the gun. Brenda J. Pratt, Perry's mother and the special administrator of Perry's estate, brought this wrongful death action against Gary, alleging that he was negligent in failing to ensure the safe storage of his gun and in entrusting it to Paul, a person shown to be unfit to possess it. Pratt also sought recovery on her own behalf for the negligent infliction of emotional distress. Four years prior to the issuance of *Jupin* v. *Kask*, 447 Mass. 141 (2006), a judge allowed Gary's motion for summary judgment on the stated basis that there was nothing in the summary judgment materials before him to suggest that Gary could have foreseen Murley's conduct, or that Gary's conduct was the proximate cause of Perry's death, or that Gary had entrusted the gun to Murley. We reverse the judgment.

1. *The facts.* We take the facts from the materials submitted on summary judgment in the light most favorable to the plaintiff. See *Foster* v. *Group Health Inc.*, 444 Mass. 668, 672 (2005). In 1994, when Paul was eighteen years of age, Gary purchased a nine millimeter handgun for Paul at Paul's request and with funds given to him by Paul.[3] The purchase was made with the understanding that Gary would transfer ownership of the gun to Paul when he became twenty-one years of age. At the time of the purchase, Paul was living in his father's home, and the gun was kept in a locked gun room in the basement of the house.

Some time after graduating from high school, Paul moved to a two-bedroom apartment in a building owned by Gary and immediately adjacent to his home. Soon after Paul moved into the apartment, Gary gave him a gun cabinet equipped with a key

---

[2] We use first names to avoid confusion.

[3] The handgun in question was manufactured by Taurus International Manufacturing, Inc. (Taurus). Although the plaintiff also brought claims against Taurus, the parties filed a stipulation of dismissal as to all of those claims. In addition, we agree with the judge's conclusion that whether Gary was an unlawful "straw purchaser" is a question irrelevant for purposes of decision on Gary's motion.

lock, installed a second key lock on the door to the room in which the gun cabinet was kept, and instructed Paul to keep his guns locked away. Paul had a collection of about twelve firearms that he stored in the cabinet. According to Gary, he took the precaution of creating a gun room in Paul's apartment to make certain Paul's firearms were "safely put away." There was, however, evidence to show that Paul frequently had his guns out while he was in the apartment, cleaning them, playing with them, and walking around with them.

Paul normally kept the keys to the gun room and the cabinet on his person. For protection, however, he kept the gun in question, with the safety off and ammunition in the clip, in the top drawer of a bureau in his bedroom. Gary knew that Paul kept the gun in his bureau drawer for self-protection, just as Paul knew that Gary also kept a gun in his own bureau drawer.[4]

Although Gary had given Paul permission to have no more than two roommates, there were times when there were as many as five or six individuals residing in the apartment. Roommates frequently changed, moving into the apartment for a few months and then leaving, and friends sometimes "crashed" there for a few nights. For some period of time, Paul shared his bedroom with a female friend who stored her belongings in his bedroom, which she used even when he was not present.

At the time of the shooting on January 11, 1996, five people were living in the apartment. All were between the ages of seventeen and twenty. They knew that Paul kept a gun in his bureau drawer because Paul had either shown them the gun or told them about it. Although Gary was aware of the fact that Paul had roommates, he did not know who or how many. Paul actively concealed that information from his father. Also, there is nothing in the materials before us to show that Gary was aware of the fact that Paul's roommates knew that Paul kept a gun in his bureau drawer.

Gary was aware, however, that Paul and his roommates hosted parties in the apartment every weekend and sometimes during the week, that partygoers' cars would be lined up along the

---

[4]Paul testified at his deposition that although he did not specifically recall telling Gary that he kept the handgun in his bureau drawer, he believed that it was something he would be likely to tell his father.

street, that alcohol was available during these parties, and that there was a strong likelihood that underage drinking was occurring.

Colin Murley moved into the apartment in September, 1995. He and Paul had attended high school together. Gary knew Murley and had never liked the fact that Paul associated with him. Gary believed that Murley had a reputation for drug use and underage drinking and considered him a "wild kid." About two months before the shooting, Gary discovered that Murley was living in the apartment and that he was smoking marijuana in the apartment or the basement of the building. Gary told Paul that he wanted Murley out of the apartment and, particularly concerned about Murley's drug use on the premises, warned Paul to "doubly make sure that [his firearms were] locked up."[5] There was also evidence to show that Paul sometimes took his friends, including Murley, to a vacant area known as "Montague Plains" to practice shooting with his guns. Gary was aware of this fact.

On the evening of January 11, 1996, Murley and Perry were at the apartment drinking beer and watching the movie "Pulp Fiction." There is no evidence in the record that Perry had ever lived in the apartment. When Murley mentioned that Paul owned a gun similar to the one in the movie, Perry asked to see it. Murley retrieved the gun from Paul's bureau drawer and, believing it to be unloaded, pointed it at Perry's head. Perry jokingly said "boom" and the gun discharged. Perry, eighteen years old at the time, was killed. Murley, then twenty years old, does not recall having pulled the trigger. Paul was not in the apartment at the time of the shooting.

Murley, who ultimately pleaded guilty to involuntary manslaughter, testified at his deposition that he took the gun

[5]There is conflicting evidence as to when Gary first learned of Murley's presence in the apartment and when he told Paul that Murley had to leave, and by what date. Gary stated at his deposition that he learned of Murley's presence in the apartment about two weeks before the shooting and that Paul told him, Gary, that Murley would be out within a week. According to Paul, there was a period of "months" between the time that his father learned of Murley's presence in the apartment and the time that his father told him he wanted Murley to leave. Paul also stated that his father had asked that Murley move out of the apartment "months" before the shooting.

from Paul's bureau without Paul's knowledge or permission and that he believed that had he sought permission, Paul would have said no.

2. *The negligence claim.* Before considering whether the materials submitted on Gary's motion for summary judgment support a conclusion that there are no genuine issues of material fact, we determine a threshold question of law: whether Gary owed a duty of reasonable care to Perry.

In *Jupin* v. *Kask*, 447 Mass. at 143-145, the court was faced with facts we deem similar to those before us. There the plaintiff claimed that the defendant was negligent in failing to secure the handgun used to kill her son. The defendant's housemate owned a large gun collection that he stored in the basement of the defendant's house. *Id.* at 143. Although the housemate's son, who had a history of violence and mental instability, did not have permission to take a gun from his father's collection, he had a key to the house that was given to him by the defendant or with her knowledge and that he was allowed to use irrespective of whether the defendant or her housemate were present. *Id.* at 144-145. The son took a gun from his father's collection and shot the plaintiff's son. *Id.* at 145. The court held that a defendant owes a duty of care to all persons who are foreseeably endangered by her conduct and that there was "no public policy justification for refusing to impose it." *Id.* at 146-148, 150-155, and cases and authorities cited.

We do not think that the fact that the fatal shot was fired by one other than Paul is sufficient to make the *Jupin* case distinguishable from and inapplicable to the present circumstances. "The general rule is that intervening conduct of a third party will relieve a defendant of culpability for antecedent negligence only if such an intervening response was not reasonably foreseeable." *Commonwealth* v. *Carlson*, 447 Mass. 79, 84 (2006). In our view, it makes no real difference whether we analyze the negligence claim against Gary in terms of foreseeability or proximate cause. As observed in *Whittaker* v. *Saraceno*, 418 Mass. 196, 198-199 (1994):

> "The word 'foreseeable' has been used to define both the limits of a duty of care and the limits of proximate

cause. . . . As a practical matter, in deciding the foresee-
ability question, it seems not important whether one
defines a duty as limited to guarding against reasonably
foreseeable risks of harm or whether one defines the neces-
sary causal connection between a breach of duty and some
harm as one in which the harm was a reasonably foresee-
able consequence of the breach of a duty."

See *Heng Or* v. *Edwards*, 62 Mass. App. Ct. 475, 490-491
(2004).

Nor do we think the *Jupin* case inapplicable because of the
difference in the facts there known to the defendant and those
known to Gary. In considering the materials before us, we are
mindful of the fact that " 'summary judgment is rarely ap-
propriate with respect to the merits of a negligence case' . . .
[and] is especially disfavored where (as here) knowledge . . . is
at issue." *White* v. *Seekonk*, 23 Mass. App. Ct. 139, 141 (1986),
quoting from *Appleby* v. *Daily Hampshire Gazette*, 395 Mass.
32, 37 (1985).

We cull from the previously recited facts those which Gary
knew or could be found to have reason to know. Gary was the
licensed owner of a firearm that he purchased for Paul; allowed
Paul to move into an apartment in a building owned by him
situated on property adjacent to his home; and provided Paul
with a locked gun cabinet, installed a lock on the door to the
room in which the cabinet was placed, and instructed Paul to
keep his guns locked away at all times. Gary knew that Paul
nonetheless kept the gun he had purchased for him in his bureau
drawer,[6] and that Paul took Murley and other friends to practice
shooting with his guns. He also knew that Paul had roommates,
but he did not know how many or their identities, other than
that of Murley, who moved in with Paul in September of 1995.
While residing in the apartment, Paul and his various room-

---

[6]The events giving rise to this action occurred prior to the enactment of
G. L. c. 140, § 131L, added by St. 1998, c. 180, § 47, which provides in
pertinent part:

"It shall be unlawful to store or keep any firearm . . . in any place un-
less such weapon is secured in a locked container or equipped with a
tamper-resistant mechanical lock or other safety device, properly
engaged so as to render such weapon inoperable by any person other
than the owner or other lawfully authorized user."

mates hosted many large parties at which alcohol was available. Gary was aware of these parties, where he suspected underage drinking was occurring. He disliked Murley, who he believed had a reputation for drug use and underage drinking, and considered him a "wild kid." When he discovered that Murley had smoked marijuana in the basement of the apartment building, the only action he took was to tell Paul that he wanted Murley out of the apartment and to warn Paul to make certain his guns were locked away.

Taking these facts in the light most favorable to the plaintiff, we cannot say that as matter of law, the risk of an accidental shooting by someone visiting or living in Paul's apartment where he kept the loaded gun in his bureau drawer was unforeseeable. See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 54-55 (1983) (college's contention that criminal attack on campus not foreseeable rejected as untenable where college administrator admitted risk of rape of a student foreseen). See also *Jupin* v. *Kask*, 447 Mass. at 148-150.

Our conclusion does not turn on the specific foreseeability of Murley's shooting of Perry with Paul's gun. We do, however, think that the fact that Gary had particular concerns about Murley, which caused him to tell Paul that he did not want Murley living in the apartment and to warn Paul to make certain his guns were locked away, adds to the sufficiency of the showing of his foreseeability of the risk of the harm that came to fruition. As stated in *Glick* v. *Prince Italian Foods of Saugus, Inc.*, 25 Mass. App. Ct. 901, 902 (1987), "[p]roximate cause does not require the particular act which caused the injury to have been foreseen, only that the general character and probability of the injury be foreseeable." See *Jupin* v. *Kask*, 447 Mass. at 149 n.8.

On the law and the facts appearing in the materials submitted on Gary's motion, we conclude that the judge erred in granting him summary judgment on the plaintiff's claim for negligence.

3. *The entrustment claim.* In *Mitchell* v. *Hastings & Koch Enterprises, Inc.*, 38 Mass. App. Ct. 271, 276-277 (1995), the court stated, in respect to negligent entrustment of a motor vehicle:

"Liability on this theory is predicated on the owner's hav-

ing entrusted a vehicle to a person who was incompetent or unfit to use it properly, whose incompetence or unfitness was the cause of the injury to the plaintiff. The general rule in Massachusetts is that the entrustor, to be liable, must have had actual knowledge of the unfitness of the entrustee (as contrasted with mere reason to know that the entrustee was unfit or incompetent). *Leone* v. *Doran*, 363 Mass. 1, 13 & n.3 (1973). *Kunkel* v. *Alger*, 10 Mass. App. Ct. 76, 82 n.6 (1980)."

See *Peters* v. *Haymarket Leasing, Inc.*, 64 Mass. App. Ct. 767, 771 (2005).

The judge concluded, and we think correctly so, that there was insufficient evidence to show that Gary entrusted the gun to Murley. In arguing to the contrary, the plaintiff cites *Foster* v. *Arthur*, 519 So. 2d 1092 (Fla. Dist. Ct. App. 1988), as support for the proposition that an entrustment to Murley could be found in that the evidence of Gary's various alleged shortcomings effectively provided Murley the opportunity to use the gun in Paul's possession.[7] We decline to follow the *Foster* case. The law of Massachusetts concerning negligent entrustment requires more than a showing of an implied invitation. See *Leone* v. *Doran*, 363 Mass. 1, 7 (1973); *Alioto* v. *Marnell*, 402 Mass. 36, 40 (1988); *Watson* v. *Salvoni*, 27 Mass. App. Ct. 735, 737 (1989). Compare *Drescher* v. *Travelers Ins. Co.*, 359 Mass. 458, 461 (1971) (father gave son general permission to use car for any purpose to which cars commonly put, and placed no restrictions on use of car).

The real question presented on this claim is one not considered by the judge, that is, whether there was sufficient evidence to show that Gary's entrustment of the gun to Paul was negligent. Our analysis of this claim is based on two premises. First, a "firearm is a dangerous instrumentality" requiring those dealing

---

[7] In the *Foster* case, the defendant kept a gun between the mattress and box spring of her bed, where it was discovered by her boyfriend, a convicted murderer, when he repaired the bed at her request. Using the defendant's gun, the boyfriend shot and paralyzed the plaintiff. In affirming the judgment against the defendant, the court held that by bringing a gun into the home she shared with the boyfriend, keeping it in an unlocked room accessible to him, and inviting discovery of the gun by asking him to repair her bed, the defendant had impliedly invited her boyfriend to use the gun. *Foster* v. *Arthur*, 519 So. 2d at 1094.

with it to exercise a "heightened" degree of care. *Jupin* v. *Kask*, 447 Mass. at 151, and authorities therein cited, including Restatement (Second) of Torts § 298 comment b (1965).[8] Second, summary judgment is disfavored in cases where knowledge is at issue. See *White* v. *Seekonk*, 23 Mass. App. Ct. at 141.

Taking the materials submitted on summary judgment in the light most favorable to the plaintiff, those materials show that Gary was the licensed owner of the gun and also owned the building in which Paul resided. He knew that Paul often took his friends on shooting outings with his guns. Although concerned about these outings, he did nothing to stop them. He also knew that Paul drank regularly, and he had seen Paul intoxicated despite being underage. Gary was also aware that Paul hosted weekend parties where alcohol was available to the underage attendees. While Gary disliked Murley and directed Paul, in December of 1995, to order Murley to leave the apartment because of Murley's use of marijuana, he took no other action in respect to Paul's living arrangements, Murley's presence in the apartment, the parties, and the drinking.

Even assuming without deciding that Gary's initial entrustment of the gun to Paul was not negligent, we think the facts set out in the summary judgment materials sufficient to put to a jury the question whether his entrustment of the gun to Paul while residing in the apartment was negligent in light of what he knew and could have known as the owner of the gun and the building.

4. *The emotional distress claim.* To recover on her claim for negligent infliction of emotional distress, the plaintiff must show that Gary's negligence caused her emotional distress "manifested by objective symptomatology," and "that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton* v. *Abbott Labs*, 386 Mass. 540, 556-557

---

[8]Comment b reads in relevant part:

"The care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised. . . . [T]hose who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them."

(1982). The trial judge granted Gary summary judgment on the plaintiff's claim of negligent infliction of emotional distress on the stated basis that she could not show that Gary's conduct was the proximate cause of her son's death. For the reasons stated in part 2, *supra*, that conclusion is erroneous.

Gary argues that he was entitled to summary judgment for the reason that the plaintiff failed to provide evidence of any physical injury.[9] To survive summary judgment on this claim, the plaintiff was required to provide objective evidence to corroborate the distress alleged. See *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 137-138 (1993); *Rodriguez* v. *Cambridge Hous. Authy.*, 443 Mass. 697, 701-702 (2005). A showing of symptoms commonly classified as mental or emotional in nature (insomnia, impaired concentration, uncontrollable crying, gastrointestinal distress, headaches, feelings of despair, anxiety, depression) may provide the type of objective evidence necessary to establish physical harm. See *Sullivan* v. *Boston Gas Co.*, *supra* at 131-133; *Kelly* v. *Brigham & Women's Hosp.*, 51 Mass. App. Ct. 297, 305-306 (2001).

The plaintiff presented records of her treatment with a clinical psychologist she began seeing in December, 1995. Those notes reflect that at that time, the plaintiff was experiencing "significant" biological signs of depression, including loss of appetite, memory difficulties, reduced attention span, fatigue, and sleep disturbance. During the few weeks leading up to her son's death, the plaintiff's condition was essentially unchanging; she was "doing fairly well . . . and her depression [was] not increasing."

Following her son's death, the plaintiff, who had a history of substance abuse, reported thoughts of suicide and resuming her use of alcohol and drugs. The psychologist also noted in March, 1996, an "increase in [the plaintiff's] biological depressive signs," including increased disruptions in sleep, appetite, and concentration, for which she agreed to take antidepressant medications, a treatment option she had previously resisted. There is also record evidence that the plaintiff left therapy for several months for reasons unrelated to our decision. She thereafter resumed therapy for another five months. In addition

---

[9] He makes no argument concerning the other elements of this claim.

to the psychologist's notes, the plaintiff presented an affidavit relating that after she learned of her son's death, she "became extremely depressed and non-functional, [and that she] could not work, go grocery shopping, or carry out functions of daily living."

Although there is no expert evidence in the record expressly linking plaintiff's deterioration of her condition to the trauma of her son's death, contrast *Sullivan* v. *Boston Gas Co.*, 414 Mass. at 140, an inference in the plaintiff's favor of a causal link is supported by the chronology of events establishing the proximate relationship between the deterioration in her condition and her son's death. We conclude that such deterioration in her condition constitutes "objective evidence" of mental distress sufficient to withstand summary judgment on this element of her claim.

5. *The reckless conduct or gross negligence claim.* Gary was granted summary judgment on this claim on the basis of an erroneous conclusion, that is, the plaintiff's failure to show foreseeability and proximate cause. See part 2, *supra*. His argument on appeal in support of the judgment is that his mere ownership of the gun and the apartment "fall far short of the culpable conduct required for a finding of reckless, wanton or gross negligence." He fails to take into account the evidence of his actions and his failures to act based on the facts he knew or had reason to know.

We begin our analysis of the plaintiff's claim with the general but not absolute rule that "[s]ummary judgment is seldom granted in a cause of action alleging reckless conduct." *Boyd* v. *National R.R. Passenger Corp.*, 446 Mass. 540, 545 (2006). Next, we consider the elements of reckless conduct and the sufficiency of the plaintiff's materials, taken in the light most favorable to her.

> "Reckless conduct may consist of a failure to act, if there is a duty to act . . . . Reckless failure to act involves an intentional or unreasonable disregard of a risk that presents a high degree of probability that substantial harm will result to another. See *Manning* v. *Nobile*, [411 Mass. 382,] 387-388 [(1991)], and cases cited. The risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the

defendant's election to run that risk or of his failure reasonably to recognize it. See *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990); *Scaia's Case*, 320 Mass. 432, 433-434 (1946); *Commonwealth* v. *Welansky*, [316 Mass. 383,] 398-399 [(1944)]; *Baines* v. *Collins*, 310 Mass. 523, 526 (1942)."

*Sandler* v. *Commonwealth*, 419 Mass. 334, 336-337 (1995).

In light of the previously discussed facts as they appear in the summary judgment materials and in view of the fact that "[a] firearm is a dangerous instrumentality . . . [requiring] a heightened amount of care . . . of persons dealing with" them, *Jupin* v. *Kask*, 447 Mass. at 151, we conclude that whether Gary's actions or inaction constitute reckless conduct presents a question to be resolved by a jury.

6. *Conclusion.* It follows from what we have said that the judgment entered on counts I (negligent entrustment), VI (reckless conduct), VIII (emotional distress), and IX (negligence) of the amended complaint is reversed, and the matter is remanded to the Superior Court for further proceedings.

*So ordered.*