# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### May 23, 2018 Session

## BENJAMIN SHEA COTTEN, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF CHRISTINA MARIE COTTEN, DECEASED, ET AL. v. JERRY SCOTT WILSON

**Appeal by Permission from the Court of Appeals
Circuit Court for Williamson County
No. 2015-194      Michael W. Binkley, Judge**

_____

**No. M2016-02402-SC-R11-CV**

_____

SHARON G. LEE, dissenting.

The Estate of Christina Marie Cotten should have its day in court. Summary judgment for Dr. Jerry Wilson is not appropriate because the issue of whether Christina Marie Cotten's suicide was a reasonably foreseeable result of Dr. Wilson's negligent conduct involves disputed questions of material fact. The majority, in lengthy footnotes, attempts to defend its decision in favor of Dr. Wilson. The reasoning in this dissent is clearly stated. I decline the invitation to debate in a series of footnotes. *See Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 319 (Tenn. 2017) (Lee, J., concurring in part and dissenting in part).

Summary judgment is appropriate only when there is no genuine issue as to any material fact. *Mann v. Alpha Tau Omega Fraternity*, 380 S.W.3d 42, 46 (Tenn. 2012) (quoting Tenn. R. Civ. P. 56.04). Our standard of review requires us to accept the Estate's evidence as true, to allow all reasonable inferences in its favor, and to resolve any doubts about the existence of a genuine issue of material fact in favor of the Estate. *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)); *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 844–45 (Tenn. 2010). To prevail on his motion for summary judgment, Dr. Wilson had to either affirmatively negate an essential element of the Estate's claim or show that the Estate's evidence at the summary judgment stage was insufficient to establish its negligence claim. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015).

*Foreseeability—A Disputed Question of Fact*[1]

Dr. Wilson, a board-certified psychiatrist, met Ms. Cotten while they were working together at Skyline Medical Center in Nashville. Dr. Wilson was the director of the military unit, and Ms. Cotten was a psychiatric nurse in the unit. In May 2011, Dr. Wilson and Ms. Cotten began having an affair. Dr. Wilson was single, but Ms. Cotten was married and had a young child. After Ms. Cotten's husband learned about the affair, they separated. In June 2012, Ms. Cotten's marriage ended in divorce, and she and her former husband shared equal parenting time.

In 2012, Dr. Wilson left Skyline Medical Center to become an Assistant Professor of Psychiatry at Vanderbilt University. Dr. Wilson's work at Vanderbilt was mainly clinical, and he did most of the inpatient coverage at the psychiatric hospital there. In 2013, Dr. Wilson left Vanderbilt for a better paying position at Rolling Hills Hospital. Dr. Wilson kept seeing Ms. Cotten after he left Skyline Medical Center and Vanderbilt.

On March 19, 2013, Dr. Roy Asta, a co-worker of Ms. Cotten's at Skyline Medical Center, began treating her for depression and anxiety. Ms. Cotten had been taking Prozac and Klonopin for some time and wanted a psychiatrist to continue her treatment. At the March appointment, Dr. Asta noted Ms. Cotten lacked energy and motivation and was having crying spells and anxiety. Ms. Cotten told Dr. Asta that she was dating Dr. Wilson and was proud of it. Dr. Asta diagnosed Ms. Cotten with depression and began treating her with Prozac, Klonopin, and supportive therapy.

On June 10, 2013, Ms. Cotten returned to see Dr. Asta. She was doing well with her medications and had no complaints. Dr. Asta again diagnosed Ms. Cotten with depression and continued the same treatment.

In October 2013, after Ms. Cotten was evicted from her home for nonpayment of rent, she moved in with Dr. Wilson. While they lived together, Dr. Wilson and Ms. Cotten discussed the possibility of marriage and children. Ms. Cotten was involved in choosing cabinetry and other furnishings for the home that they would share in Franklin, Tennessee. Dr. Wilson noticed that Ms. Cotten was having crying spells, was not as energetic and motivated, and some days did not take care of herself. He described her depression as extremely variable—she would do well for days at a time then be down for a day or two.

---

[1] We have taken the facts from the parties' responses to the statements of undisputed material facts and from the deposition excerpts filed by Dr. Wilson. The record lacks the deposition excerpts cited by the Estate.

By late 2013, Dr. Wilson knew that Ms. Cotten suffered from mental health issues, including depression. Dr. Wilson also knew that Dr. Asta was treating Ms. Cotten for depression and that she was taking Prozac and Klonopin.

On January 23, 2014, Ms. Cotten's former husband petitioned to gain "majority custody" of their young child because he was concerned about Ms. Cotten moving with Dr. Wilson to Franklin. Before January 2014 and the filing of the custody petition, Mr. Cotten noticed that Ms. Cotten seemed unstable and not her normal happy self.

On January 26, 2014, Ms. Cotten tried to kill herself at Dr. Wilson's home with an overdose of alcohol and sleeping pills. Friends of Ms. Cotten took her to the Nashville General Hospital emergency room. The doctor at the hospital diagnosed Ms. Cotten with depression, anxiety disorder, acute alcohol intoxication, and medication overdose. The doctor called a mobile crisis unit to conduct a mental health evaluation based, in part, on the history given by friends of Ms. Cotten of her trying to hurt herself.

During the evaluation, Ms. Cotten told the mobile crisis counselor that stressors in her life included her ex-husband's court filing to modify custody and Ms. Cotten's feeling that her boyfriend, who was a psychiatrist, "[did] not care." Ms. Cotten reported a history of depression and anxiety. The crisis counselor found that Ms. Cotten had symptoms suggestive of depressive disorder, was not receptive to treatment, and appeared to be at imminent risk of self-harm. The counselor recommended a referral for Ms. Cotten for inpatient psychiatric treatment, evaluation, and monitoring. The counselor arranged for Ms. Cotten to be transported to the Middle Tennessee Mental Health Institute for voluntary or involuntary admission. The basis for the admission was the counselor's assessment that Ms. Cotten was unable to avoid severe impairment or injury and had a likelihood of potential self-harm.

After Ms. Cotten arrived at the Middle Tennessee Mental Health Institute, Dr. Philip Brooks, a psychiatrist, evaluated her and discussed her condition with Dr. Wilson. Dr. Brooks did not admit Ms. Cotten for inpatient treatment. Instead, Dr. Brooks decided to discharge her, in part, because he knew she was going home with Dr. Wilson. Dr. Brooks directed Ms. Cotten to follow up with her outpatient psychiatrist, who was Dr. Asta, within seven days.[2] Dr. Brooks talked with Dr. Wilson for ten or fifteen minutes,

_____

[2] Dr. Wilson gave differing accounts about Dr. Brooks' instructions. Dr. Wilson did not dispute the statements in the Estate's Additional Statement of Undisputed Material Facts that Dr. Brooks said Ms. Cotten needed follow-up psychiatric care, and that Dr. Wilson assured Dr. Brooks that Ms. Cotten would follow up with her outpatient psychiatrist. Yet Dr. Wilson denied in his deposition that he was told that Ms. Cotten should see her outpatient psychiatrist within seven days and that he received any recommendations about her safety or outpatient care. Dr. Wilson also testified that he did not know

stressing the need for follow-up care and for Dr. Wilson to be a support system for Ms. Cotten. Dr. Wilson assured Dr. Brooks that Ms. Cotten would follow up with her outpatient psychiatrist within seven days. Dr. Wilson's assurances factored significantly into Dr. Brooks' decision to discharge Ms. Cotten.

Despite Dr. Brooks' instructions and Dr. Wilson's assurances, Ms. Cotten did not see Dr. Asta within seven days. Ms. Cotten did not return to see Dr. Asta until June 13, 2014. Neither Dr. Wilson nor Ms. Cotten told Dr. Asta about her suicide attempt. Ms. Cotten first denied that she had attempted suicide, but later admitted to Dr. Wilson that she had tried to kill herself.

In April 2014, Ms. Cotten's former husband prevailed in his petition to modify custody. As a result, Ms. Cotten went from having equal parenting time to visiting with her son every other weekend.

In June 2014, Dr. Wilson noticed that "after she was stripped of custody of her son," Ms. Cotten was having frequent crying spells occurring once or twice a week, wanted to sleep a lot, and was ruminating on the loss of time with her child.

On June 13, 2014, Dr. Asta saw Ms. Cotten after she called him in distress and crying. He noted that she was doing poorly, was having crying spells, and was more depressed than she had been before.

At some point before mid-August 2014, Dr. Wilson told Ms. Cotten she was not making good decisions and "was putting their family constantly in jeopardy."

In mid-August 2014, Dr. Wilson told Ms. Cotten that it was "time to move on" and that he did not see a future for them. Ms. Cotten moved out of Dr. Wilson's house, but they continued to communicate by telephone, text messages, and email. Dr. Wilson and Ms. Cotten did more than communicate; they continued to have sexual relations. Ms. Cotten would sometimes stay with Dr. Wilson after she moved out, and they sometimes talked about reconciling.

In late August 2014, after moving out of Dr. Wilson's house, Ms. Cotten returned to Dr. Asta for treatment for depression and anxiety. She told him that she had broken up with her boyfriend and described their relationship as "being rocky."

---

whether Ms. Cotten saw a psychiatrist within seven days after being discharged. The summary judgment standard of review requires us to resolve these factual disputes in favor of the Estate.

On October 14, 2014, Ms. Cotten called Dr. Asta for medication refills and told him that she was planning to move back in with Dr. Wilson.

On October 26, 2014, Dr. Wilson brought out a handgun at his home and showed it to Ms. Cotten and her son while they were visiting. Dr. Wilson told Ms. Cotten that his father had given him the gun and let her handle it before Dr. Wilson put it away in the next room. Ms. Cotten knew that Dr. Wilson kept the gun in the dining room of his home. The gun was in an unlocked drawer of the china cabinet, and the ammunition was in an adjacent unlocked drawer.

The same day Dr. Wilson showed Ms. Cotten his gun, he told her that he was seeing another woman. Ms. Cotten became angry, accused Dr. Wilson of using her for sex, and stormed out of the house. Later, Dr. Wilson and Ms. Cotten continued to communicate, with mixed feelings about reconciling.

After the October 26, 2014 gun incident at Dr. Wilson's house, Ms. Cotten's former husband became concerned. On October 29, 2014, Mr. Cotten called the police and requested a welfare check on Ms. Cotten after being told by his son that Dr. Wilson had guns and was fighting with Ms. Cotten. Mr. Cotten also told Ms. Cotten that if she continued living with Dr. Wilson, then Mr. Cotten would consider seeking to have her visitation with their son supervised. Dr. Wilson stated in Fact No. 11 of his Statement of Undisputed Material Facts that "the threat of losing more time with her son caused Ms. Cotten to become further emotionally distraught." When the following facts of Dr. Wilson's Statement of Undisputed Material Facts are read in order, it is clear that October 2014 is when Ms. Cotten became "further emotionally distraught" and that Dr. Wilson knew about her condition:

Fact No. 4 In June of 2012, Mr. and Mrs. Cotten finalized their divorce.
Fact No. 5 Their divorce mandated that they split parenting time . . . .
Fact No. 6 The equal split of parenting time continued until April 2014.
Fact No. 7 Mr. Cotten originally filed for majority custody in January of 2014.
Fact No. 8 After Mr. Cotten filed for majority custody, Ms. Cotten became emotionally unstable and attempted to take her own life in January of 2014.
Fact No. 9 The [causal] link between Mr. Cotten filing for majority custody and Ms. Cotten's attempted suicide was discussed in the psychiatric note in January 2014.
Fact No. 10 In October 2014, Mr. Cotten threatened to restrict further Ms. Cotten's access to her son . . . by limited [sic] her time with him to supervised visits only.

Fact No. 11 The threat of losing more time with her son caused Ms. Cotten to become further emotionally distraught.

Dr. Wilson cites Mr. Cotten's deposition in which he acknowledged that the stressor Ms. Cotten described at the time of her January 2014 suicide attempt was Mr. Cotten's effort to obtain primary custody of their child. Then, after the gun incident of October 26, 2014, and within days of Ms. Cotten's suicide, Mr. Cotten started talking to her about further restricting her parenting time with their child by requiring her visitation time to be supervised. This testimony about the threat of further restriction on Ms. Cotten's parenting time supports Dr. Wilson's statement that the threat of losing *more* time with her son caused Ms. Cotten to become further emotionally distraught in October 2014.

The Estate objected to Fact No. 11 as not being contained in the deposition references cited by Dr. Wilson, but the Estate did not dispute the truth of this statement. Even if there is some confusion about whether Dr. Wilson knew that Ms. Cotten became more emotionally distraught in June or late October, our standard of review requires us to resolve all reasonable inferences in the Estate's favor—not Dr. Wilson's. Thus, we must resolve any confusion in favor of a finding that it was in late October—shortly before Ms. Cotten committed suicide with the gun supplied by Dr. Wilson. The cited deposition testimony of Mr. Cotten supports Dr. Wilson's asserted fact that Ms. Cotten became "further emotionally distraught" after Mr. Cotten discussed with her in October 2014 the possibility of losing more time with her son. The inference to be drawn from Dr. Wilson's *own* stated chronology in Facts 4 through 11 is that he was aware of these facts—asserted by him as undisputed—in October 2014.

About a week after showing Ms. Cotten his gun and telling her he was seeing another woman, Dr. Wilson allowed Ms. Cotten, who told him she had been evicted from her apartment and had nowhere to live, to stay at his house while he was out of town. Dr. Wilson returned home from his trip on November 5, 2014. He left again from November 6 to November 9, 2014. While Ms. Cotten stayed at Dr. Wilson's house, they communicated by text messages, discussing whether to pursue their relationship or "let it go."

On the afternoon of November 9, 2014, Dr. Wilson came home to find Ms. Cotten unresponsive in an upstairs bedroom. Dr. Wilson's immediate thought was suicide—that she must have overdosed. Dr. Wilson discovered a gunshot wound in Ms. Cotten's chest after he started resuscitation efforts. Dr. Wilson found his gun on the bed, next to Ms. Cotten's body.

Ms. Cotten's friend, Kami Turner, notified Dr. Asta about Ms. Cotten's suicide. According to Dr. Asta, after Ms. Cotten's January 2014 suicide attempt, a responsible

psychiatrist should have called to let Dr. Asta know that one of his patients had been hospitalized. Dr. Asta said that had he been notified, he would have responded by evaluating Ms. Cotten to determine what caused her to decompensate and then would have changed her treatment and medications. Dr. Asta also would have worked on a plan to make sure that Ms. Cotten took her medications correctly, became more compliant with her treatment, and stopped drinking alcohol.

Dr. Asta testified, and Dr. Wilson does not dispute, that because Ms. Cotten denied she was suicidal, it would have been more incumbent upon Dr. Wilson to inform Dr. Asta of Ms. Cotten's suicide attempt. Although Dr. Asta noted that Ms. Cotten had no suicidal ideations when he last saw her on October 14, 2014, he did not know then about her January 2014 suicide attempt. Dr. Asta also testified that, as a psychiatrist, he would be concerned that a clinically depressed and anxious person was in a home with access to a gun. Dr. Asta also noted, and Dr. Wilson does not dispute, that a person with symptoms of depression or anxiety is at an increased risk of suicide, and the likelihood of a successful suicide attempt is much higher with a gun than by pills or other means. According to Dr. Asta, and also undisputed by Dr. Wilson, a gun should not be shown to a person who is depressed, anxious, and has a history of suicide attempts.

Dr. Brooks, the psychiatrist who admitted Ms. Cotten to the Middle Tennessee Mental Health Institute and released her in the care of Dr. Wilson, testified that when dealing with mental health issues, one of the main questions is whether there are any guns in the house. If there are guns present, a psychiatric patient cannot be released to that home after a suicide attempt until the guns are removed. After Ms. Cotten's suicide attempt, had Dr. Brooks been told by Dr. Wilson that he had guns in his home, Dr. Brooks would have emphasized to Dr. Wilson that the guns should be removed or safely locked away. Although there were no guns in the house in January 2014, it is only reasonable to infer that Dr. Wilson, as a board-certified psychiatrist, should have had the same concerns in October and November 2014 about having a gun in the home when he knew that Ms. Cotten was depressed, anxious, and had a history of attempted suicide in his home.

In sum, Ms. Cotten paid a high price for her affair with Dr. Wilson. She lost her marriage, her home, and equal parenting time with her son. In March 2013, she began receiving psychiatric treatment for her ongoing depression, anxiety, and unhappiness. In January 2014, she attempted suicide in Dr. Wilson's home after learning that her former husband was seeking primary custody of their son. After her suicide attempt, Ms. Cotten did not receive timely follow-up psychiatric care. Ms. Cotten saw her psychiatrist in June and August 2014 for depression. In October 2014, Ms. Cotten received refills of her depression medications. By late October 2014, when she was planning to move back in with Dr. Wilson, he told her he was seeing another woman, and Ms. Cotten's former

husband told her he was considering limiting her parenting time to supervised visitation. It all became too much for Ms. Cotten. On November 9, 2014, she killed herself with the gun that Dr. Wilson had brought into his house, shown her, and failed to secure. All these facts, taken in the light most favorable to the Estate, show that there are disputed questions of fact about whether Ms. Cotten's suicide was a foreseeable result of Dr. Wilson's negligent conduct.

In reviewing the trial court's grant of summary judgment, we first cannot ignore that Dr. Wilson is a board-certified psychiatrist. Dr. Wilson worked as a psychiatrist at Skyline Medical Center, held the position of Assistant Professor of Psychiatry and practiced psychiatry at Vanderbilt—a prestigious university—and practiced psychiatry at Rolling Hills Hospital. Viewing the evidence in the light most favorable to the Estate, Dr. Wilson knew about Ms. Cotten's continuing depression, the link between depression and suicide, and the need to keep a gun away from a person suffering from depression. Dr. Wilson owed no professional duty to Ms. Cotten; he was not her treating psychiatrist. That said, Dr. Wilson's professional training and experience as a psychiatrist provided him with knowledge and insight that necessarily affect the analysis about whether Ms. Cotten's suicide was reasonably foreseeable to him. Dr. Wilson does not dispute that a person with Ms. Cotten's mental health issues and previous suicide attempt should not have been made aware of or have had access to a gun. At the very least, Dr. Wilson's admitted awareness of the risk posed to Ms. Cotten by giving her access to a gun raises a question of fact about whether Ms. Cotten's suicide was reasonably foreseeable to him.

Second, viewed in the light most favorable to the Estate, the evidence shows that Dr. Wilson knew or should have known that Ms. Cotten suffered from depression in October and November 2014. Ms. Cotten was treated for depression beginning in March 2013. Ms. Cotten attempted suicide in January 2014 and was taken to a mental health facility. Dr. Wilson assured Dr. Brooks that Ms. Cotten would see her psychiatrist within seven days after her release from the facility. But there was neither timely psychiatric treatment nor notice to Dr. Asta of the suicide attempt. In April 2014, Ms. Cotten's time with her son was reduced from equal parenting to every other weekend. In June 2014, Dr. Wilson described Ms. Cotten as frequently crying, wanting to sleep a lot, and ruminating on the loss of time with her child. On June 13, 2014, Dr. Asta saw Ms. Cotten after she called him in distress and crying. Dr. Asta noted that she was doing poorly, was having crying spells, and was more depressed.

Ms. Cotten's depression continued after June 2014. Dr. Asta saw Ms. Cotten on August 29, 2014, for continued complaints of depression and anxiety. Ms. Cotten told Dr. Asta that she had broken up with Dr. Wilson, describing their relationship as "rocky." The next time—and the last time—she spoke to Dr. Asta, was October 14, 2014, when she called to obtain refills of her medications for depression, suggesting a continuing

need for the medications. At that time, Ms. Cotten told Dr. Asta that she was planning to move back in with Dr. Wilson. On October 26, 2014, Dr. Wilson showed Ms. Cotten his gun. He also told her he was seeing another woman, prompting an angry outburst from Ms. Cotten. The October 26 incident caused Ms. Cotten's former husband to request a police welfare check on Ms. Cotten and to tell her that he was considering seeking to have her parenting time supervised. According to Dr. Wilson's Statement of Undisputed Material Facts, Mr. Cotten's suggestion of supervised visitation caused Ms. Cotten to become "further emotionally distraught" in late October 2014, showing Dr. Wilson's knowledge of Ms. Cotten's mental instability.

The stressors that Ms. Cotten cited after her January 2014 suicide attempt—her former husband filing for a change in her parenting time and her psychiatrist boyfriend not caring about her—were again present in November 2014 and were known to Dr. Wilson.

Third, we cannot ignore the testimony of Dr. Asta and Dr. Brooks. Viewing the evidence in the light most favorable to the Estate, the testimony of Dr. Asta and Dr. Brooks is probative of the concerns that a psychiatrist, such as Dr. Wilson, should have had about leaving a gun and ammunition unsecured and accessible to a person like Ms. Cotten who, based on undisputed proof, was depressed and suffering from mental health issues. According to Dr. Asta, after the January 2014 suicide attempt, a responsible psychiatrist should have advised him that one of Dr. Asta's patients had been in the hospital. This must have been one reason that Dr. Brooks had Dr. Wilson assure him that Ms. Cotten would see Dr. Asta for follow-up care within seven days. Dr. Asta would have made changes to her treatment if he had known of the January 2014 suicide attempt. Both Dr. Asta and Dr. Brooks were of the opinion—not disputed by Dr. Wilson—that a person with Ms. Cotten's mental health issues and previous suicide attempt should not have been made aware of or have had access to a gun.

Finally, facts that are irrelevant should not be considered. This includes information found on Ms. Cotten's personal computer after her death suggesting that she may have been involved in prostitution or X-rated filmmaking, or both. There is no evidence that these activities contributed to her suicide. Our focus should be on what Dr. Wilson knew or should have known in November 2014 that would make Ms. Cotten's suicide with his gun reasonably foreseeable. Information that Dr. Wilson learned from Ms. Cotten's computer *after* her death cannot be made relevant by suggesting that she did not share with Dr. Wilson, her family, or friends every private detail of her life. What is relevant is the ample evidence in the record—undisputed by Dr. Wilson—that he knew he should not leave someone with Ms. Cotten's mental health issues and history of attempted suicide alone with access to a gun and ammunition. The information about Ms. Cotten's alleged "illicit activities" has no bearing on the issue of foreseeability, makes an

assumption unsupported by the evidence, fails to allow all reasonable inferences in favor of the Estate as required, and serves to cast Ms. Cotten in a bad light to justify a result.

No doubt, Ms. Cotten suffered from depression and made some bad decisions in the last few years of her life. But Dr. Wilson was along for the ride. He was fully aware of Ms. Cotten's instability, their "rocky" relationship, her suicide attempt, the lack of timely follow-up care, the lack of notice to her psychiatrist of the suicide attempt, her on-going depression, and the potential restriction of her parenting time that caused Ms. Cotten to become "further emotionally distraught" shortly before her suicide. Yet Dr. Wilson brought a gun into his home and showed it to Ms. Cotten, while on the same day telling her he was seeing another woman. Dr. Wilson failed to secure the gun, even though he knew that a person with symptoms of depression or anxiety is at an increased risk of suicide, and that the likelihood of a successful suicide attempt is much higher with a gun than by pills or other means.

We do not know how a jury would determine the Estate's claim against Dr. Wilson after considering all the evidence. But at this early stage of the case, and based on limited evidence, there are disputed questions of material fact about the foreseeability of Ms. Cotten's suicide. This Court should not assume the role of fact-finder. Instead, this Court should follow the standard of review by accepting the Estate's evidence as true, by allowing all reasonable inferences in the Estate's favor (not in Dr. Wilson's favor), and by resolving any doubts about the existence of a genuine issue of material fact in favor of the Estate.

*Foreseeability and White v. Lawrence*

This Court in *White v. Lawrence*, 975 S.W.2d 525, 530 (Tenn. 1998), held that the crucial inquiry in a suicide case "is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide." If the suicide was reasonably foreseeable, then it was not an independent intervening cause that would break the chain of legal causation. *Id.* In *White*, we overruled cases holding to the contrary and cited cases consistent with our holding. *Id.*[3] Denying summary judgment for

---

[3] *See Jacoves v. United Merch. Corp.*, 11 Cal. Rptr. 2d 468, 482–83 (Cal. Ct. App. 1992) (finding neither a patient's suicide nor the failure of the patient's family and subsequent treating physicians to prevent the suicide was a superseding cause when the suicide was a foreseeable risk of the defendant hospital's negligence in prematurely discharging the patient without adequate warnings to his caretakers); *Summit Bank v. Panos*, 570 N.E.2d 960, 968–69 (Ind. Ct. App. 1991) (finding questions of fact remained about whether misuse of prescriptions was foreseeable given the physician's knowledge of the patient's emotional issues, whether the patient's death was suicide or accidental overdose, and whether the suicide would have occurred if the physician had given adequate warnings), *abrogated in part by Vergara ex rel.*

the defendant, the *White* Court relied on tort principles, rather than the suicide rule and any exceptions to the rule. *Id.* at 530. Consistent with *White*, the Court of Appeals in *Ramsey v. Cocke County*, No. E2016-02145-COA-R3-CV, 2017 WL 2713213 (Tenn. Ct. App. June 23, 2017) (quoting *Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 748 (M.D. Tenn. 2010)), properly held that the crucial inquiry was whether the decedent's suicide was foreseeable and "'not whether a given case fits into a previously carved-out exception.'"

The suicide rule is "based on outdated science and a debatable appraisal of society's views concerning the morality of suicide" that "tends to short-circuit commonsense inquiry into causation." Alex B. Long, *Abolishing the Suicide Rule*, 113 Nw. U. L. Rev. 767, 824 (2019). Rather than getting lost in the maze of the suicide rule and its exceptions, the *White* Court analyzed the issue based on tort law, holding that the key question was foreseeability. As Professor Long aptly noted, "While the special and often unpredictable nature of suicide needs to be taken into account in wrongful death actions, tort law already has the tools in place to effectively deal with such cases. Courts need only begin using them." *Id.*

This Court made clear in *White* that the proximate cause analysis in a suicide case should start and end with foreseeability. 975 S.W.2d at 530. There is no basis for a heightened standard of proof, or more "solid evidence," when the asserted superseding cause is suicide. By viewing suicide in terms of foreseeability, *White* provided a straightforward approach, doing away with the confusing and unnecessary series of exceptions to the suicide rule. We should not retreat from *White* by reverting to a discussion of exceptions to the suicide rule and analyzing the facts in those terms. Here, the majority's exception approach needlessly complicates the analysis that this Court in *White* sensibly reduced to the issue of foreseeability, thus abrogating the categorical approach of exceptions to the suicide rule, as the courts in *Ramsey* and *Smith* correctly recognized. If the majority unwisely intends to revert back to the suicide rule and its categories of exceptions, it should expressly overrule *White*.

Here, foreseeability rests largely on whether Dr. Wilson could have reasonably foreseen Ms. Cotten's suicide after showing her his gun and then leaving her alone in his house with his gun unsecured. *See Borne*, 532 S.W.3d at 299 (quoting *White v. Premier Med. Grp.*, 254 S.W.3d 411, 417 (Tenn. Ct. App. 2007)) (setting forth the elements of the

---

*Vergara v. Doan*, 593 N.E.2d 185 (Ind. 1992); *Cowan v. Doering*, 545 A.2d 159, 166 (N.J. 1988) (holding that the jury properly rejected the defense of intervening cause because it was foreseeable that defendants' conduct created a risk that plaintiff would attempt suicide); *Champagne v. United States*, 513 N.W.2d 75, 81 (N.D. 1994) (holding that if the risk of suicide is a foreseeable result of a medical provider's breach of duty, the suicide cannot be considered a superseding cause).

superseding cause defense, including the fourth element that "the superseding cause must not have been reasonably foreseen by the original negligent party"); *White*, 975 S.W.2d at 529 ("'[A]n intervening act will not exculpate the original wrongdoer unless it is shown that the intervening act could not have been reasonably anticipated.'") (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)).

Dr. Wilson knew about Ms. Cotten's on-going mental health issues and previous suicide attempt. Dr. Wilson, as a board-certified psychiatrist, does not dispute that a person with depression should never be shown a gun or made aware that a gun is on the premises. That said, Dr. Wilson showed Ms. Cotten the gun at a particularly low point in her life and left her alone in his house with the unsecured gun. He did this knowing her history of depression, that he had told her he was seeing another woman, and that she was "further emotionally distraught" over a custody issue—the same type of issue that had caused her suicide attempt only nine months before.

In a similar case, *Delaney v. Reynolds*, 825 N.E.2d 554 (Mass. App. Ct. 2005), the Appeals Court of Massachusetts reversed summary judgment for the defendant, finding there were disputed material questions of fact. In *Delaney*, the parties were living together, and the defendant knew his girlfriend-plaintiff was receiving treatment for substance abuse and depression. *Id.* at 555. He left his gun, unsecured, in the home they shared. *Id.* The defendant had noticed in the month before the plaintiff's attempted suicide that she was experiencing depression, feelings of isolation, and fatigue. *Id.* The plaintiff claimed—and the defendant denied—that the defendant knew the plaintiff had previously attempted suicide. *Id.* The plaintiff additionally claimed—and the defendant denied—that she told the defendant she wanted to end her life and that his response was to hand her a gun and tell her to shoot herself outside. *Id.* at 555–56. She did not shoot herself that day, and she claimed that when she went back into the house, the defendant told her the gun was not loaded. *Id.* at 556. The plaintiff also claimed that she later told the defendant during a telephone conversation that she wanted to die. *Id.* One night, following an argument with the defendant, the plaintiff shot herself. *Id.* She later claimed she did not know the gun was loaded, and thus did not intend to kill herself. *Id.* The *Delaney* court reversed the trial court's award of summary judgment for the defendant, noting that "whether the risk of injury was foreseeable is almost always one of fact." *Id.* at 558–59 (quoting *Moose v. Mass. Inst. of Tech.*, 683 N.E.2d 706, 710 (Mass. App. Ct. 1997)); *see also White v. Town of Seekonk*, 499 N.E.2d 842, 843–44 (Mass. App. Ct. 1986) (holding that the plaintiff was entitled to a jury trial about whether a police department knew or should have known that a prisoner was a suicide risk and concluding that summary judgment is especially disfavored when knowledge is at issue).

Similar to the *Delaney* defendant, Dr. Wilson knew Ms. Cotten was depressed and was receiving treatment for depression. Unlike the defendant in *Delaney*, it is undisputed

that Dr. Wilson was aware of Ms. Cotten's history of attempted suicide. He was also aware of the additional emotional distress caused by the threat of her parenting time being further restricted. Also unlike the *Delaney* defendant, it is undisputed that, as a psychiatrist, Dr. Wilson was aware of the risk that access to his gun posed to Ms. Cotten. Ms. Cotten unfortunately, unlike the plaintiff in *Delaney*, did not live to testify about what she told Dr. Wilson and what went on between them during her last days or to dispute his self-serving testimony.

*Conclusion*

If the facts are viewed in the light most favorable to Dr. Wilson, he might prevail on summary judgment. But this Court is required to accept the Estate's evidence as true, to allow all reasonable inferences in its favor, and to resolve any doubts about the existence of a genuine issue of material fact in favor of the Estate—not in favor of Dr. Wilson.

After applying the correct standard of review, I conclude that there are disputed questions of material fact about the foreseeability of Ms. Cotten's suicide. Reasonable minds could draw more than one conclusion about the foreseeability of Ms. Cotten's suicide. Thus, the Estate should have the opportunity to develop and present its evidence so that a jury who has seen and heard the witnesses, not an appellate court, can decide whether the risk of Ms. Cotten's suicide was reasonably foreseeable to Dr. Wilson.

For these reasons, I dissent and would allow this case to proceed.

_____
SHARON G. LEE, JUSTICE